# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | |
|---|---|
| CASEY CALL, | : Case No. 3:18-cv-00149 |
| Plaintiff, | : District Judge Thomas M. Rose |
| | : Magistrate Judge Sharon L. Ovington |
| vs. | : |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : |
| Defendant. | : |

## REPORT AND RECOMMENDATIONS[1]

### I.  Introduction

Plaintiff Casey Call asserts that his many health problems prevent him from working. In August 2016, he turned to the Social Security Administration for assistance by applying for Disability Insurance Benefits and Supplemental Security Income. After initial administrative proceedings, Administrative Law Judge Elizabeth A. Motta denied Plaintiff's applications based on her conclusion that he was not under a "disability," as the Social Security Act defines it. (Doc. #6, *PageID* #s 71-86).

In the present case, Plaintiff challenges ALJ Motta's non-disability decision on two main grounds—namely, ALJ Motta committed reversible error in evaluating the medical-source opinions and in evaluating his pain and other symptoms. He seeks an Order remanding this matter for benefits or, at a minimum, for further administrative proceedings.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

The Commissioner finds no reversible error in the ALJ's decision and asks the Court to affirm her decision.

## II. Background

Plaintiff asserts that he was under a benefits-qualifying disability starting on August 17, 2015. He was 35 years old on that date and considered a "younger person" under social security law. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).[2] He has a high-school education and worked as a landscape foreman.

### A. Plaintiff's Background

Plaintiff testified at the administrative hearing that he lived in his wife and two school-aged children, and his wife's parents. They lived in his wife's parents' house because, since July 2017, he could no longer care for their previous home and property. (Doc. # 6, *PageID* #s 97-98).

Plaintiff explained that his ability work as a landscape foreman ended due to Gardner syndrome and his resulting inability to continue with the work. *Id.* at 99-100.

"Gardner syndrome is a form of familial adenomatous … that is characterized by multiple colorectal polypus and various types of tumors, both benign (noncancerous) and malignant (cancerous). People affected by Gardner syndrome have a high risk of developing colorectal cancer at an early age…."

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

http://rarediseases.info.nih.gov/diseases/6482/gardern-syndrome. The dangerous nature of this rare disease is readily seen:

> The signs and symptoms of Gardner syndrome vary from person to person. It is … characterized primarily by hundreds to thousands of noncancerous … polyps in the colon that begin to appear at an average age of 16. Unless the colon is removed, these polyps will become malignant…, leading to early-onset colorectal cancer at an average age of 39 years.

*Id.* As ALJ Motta noted, "There is no doubt that [Plaintiff] has a serious disease…." (Doc. #6, *PageID* #80).

When ALJ Motta asked Plaintiff to describe what bothers him the most, he explained, "I thought I would be a lot better off than I am right now that—since I've lost my colon, large intestines—for me, I go to the bathroom 15 to 20 times a day right now. Every bit of it is painful. Every bit of it's painful. Just digesting food is a job in itself for me, along with the … medications, staying hydrated, and staying nourished." *Id.* at 101-02. Plaintiff reported that he had a colostomy, leaving him with a colostomy bag. A few months later (in December 2016) he underwent a reversal surgery, thus eliminating his need for a colostomy bag. *Id.* at 102.

When asked about his "big issue" with constipation, he responded, "[t]hat was pre-surgery. That was one of my main complaints when I actually had my colon still. But since then, that's no longer an issue for me. It's quite the opposite." *Id.* at 102. In this context, "quite the opposite" refers diarrhea for which he takes Imodium 3 times per day and Bentyl but these do not help him. *See id.* at 102-04. He must be careful to drink enough water with these medications to prevent blockage in his small bowel (he had already experienced 3).

*Id*. at 104. He also took additional medications Promathezine, Zofran, and Reglan for nausea; Sulindac for tumor and polyp suppression; Valium as a muscle relaxer; Tramadol for pain; and Protoniz for ulcers. He does not feel the medications work. *Id.* at 104. Plaintiff's abdominal pain is "never lower than a 5 or 6, and it goes up to a 9 or 10." *Id.* at 110. He starts every day with nausea and vomiting. *Id.* Plaintiff noted that his disease causes him to be constantly on the lookout for cancer. *Id.* at 109.

Plaintiff testified that after he stopped working as a landscape foreman, he worked part time at a gas station as a cashier and stock person. *Id.* at 100. He was fired from this part-time job because he had too many doctors' appointments. *Id.* at 106.

In early 2017, when Plaintiff cared for his children by himself, he microwaved frozen meals, and his children helped with housework. *Id.* at 106, 108. He relied on family members to help with yardwork because "it is too much." *Id.* at 106-07. His other daily activities were very limited. He could do some shopping. *Id.* He described himself as "a homebody." *Id*. at 107. He did Sudoku puzzles but little else. And he sometimes took his children to the park but otherwise could rarely play with them. *Id.* at 107-08.

    **B.**    **Medical Opinions**

        *i.*    *Sarah Khavari, M.D. - Primary care physician*

In July 2016, Dr. Khavari completed a basic-medical form, noting that she first saw Plaintiff in 2009. (Doc. #6, *PageID* #526). She reported diagnoses of Gardner syndrome with no change ("s/p") after his total thyroidectomy and total procto-colectomy with J Pouch and ileostomy.

Dr. Khavari also noted that Plaintiff had cervical disc disease with no change after a cervical fusion at C4-C5 and C5-C6, depression, and anxiety. *Id*. She reported that his neck and back issues affected his ability to stand, walk, sit, lift, carry, push, pull, bend, reach, and perform repetitive foot movements. And she indicated, "Bending is also affected by abdominal pain, seeing [is] affected by [left] eye floaters, hearing [is] affected by [Left] ear tinnitus." *Id*. at 527.

Dr. Khavari further reported, in July 2016, that Plaintiff has a history of fatigue, migraines, leg numbness, throat/ neck pain from thyroid. He was scheduled for a total thyroidectomy on July 28, 2016. *Id*. at 568. On examination, Dr. Khavari that Plaintiff had limited range of motion of the cervical and lumbar spine, hips, and knees. She observed that he exhibited numbness in his fingertips and both legs. *Id.* at 569. Plaintiff's reflexes, gait, and stance were normal. *Id*.

Dr. Khavari completed that Basic Medical form in July 2016. She opined that Plaintiff was extremely limited in bending due to his back. She thought he could lift up to 20 pounds, stand/walk for 6 hours a day, and sit for 4-5 hours during an 8-hour workday. Dr. Khavari also opined that Plaintiff was markedly limited in his ability to reach due to lower back strain and neck. She checked boxes indicating her opinion that Plaintiff was unemployable and that his physical limitations would last between 9 and 11 months. *Id.* at 418-19.

    *ii.*    *Gail Mutchler, M.D. and Michael Hallet, M.D. – State Agency Reviewers*

In November 2016, Dr. Mutchler reviewed Plaintiff's record and completed an

5

evaluation regarding Plaintiff's physical impairments. (Doc. #8, *PageID* #s 1556-69). She opined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently. He could stand/walk for 6 hours out of 8 and sit for 6 hours out of 8. *Id.* at 1564. Dr. Mutchler found that Plaintiff "should have access to reasonably close restroom access as needed," and he "should avoid environments where this is not expected." *Id.* at 1566.

Three months later, Dr. Hallet reviewed Plaintiff's record and affirmed Dr. Mutchler's evaluation. *Id.* at 1571-82.

### III. "Disability" Defined

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from working a paid job—*i.e.*, engaging in "any substantial gainful activity." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

ALJ Motta determined that Plaintiff was not under a disability under the Regulation's 5-step framework. *See* 20 C.F.R. § 404.1520(a)(4). Her main findings included that Plaintiff had certain severe impairments: "Gardner's Syndrome (intestinal polyps) with residuals of surgery; residuals of remote cervical spine surgery; and thoracolumbar degenerative changes." (Doc. #6, *PageID* #74). She also concluded that the most Plaintiff

could do despite his impairments—his "residual functional capacity," 20 C.F.R. § 404.1545—was light work subject to the following limits:

> lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk each for six hours in an eight-hour workday; occasional postural activities (such as climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling); no climbing ladders, ropes, or scaffolds; no exposure to hazards, such as dangerous machinery or working at unprotected heights; occasional overhead reaching bilaterally, and frequent reaching in all other directions; occasional use of foot controls; and low stress work with no strict production quotas or fast pace and only routine work with few changes in the work setting.

(Doc. #6, *PageID* #78). The ALJ also found that Plaintiff was unable to perform his past relevant work but could perform a significant number of jobs available in the national economies. These conclusions steered the ALJ to her final conclusions that Plaintiff was not under a disability and not eligible to receive benefits. *Id*. at 86.

## IV. Standard of Review

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard

is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry— reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.     Discussion

Plaintiff contends that the ALJ committed reversible error by not crediting Dr. Mutchler's and Dr. Hallet's opinions that he "should have access to reasonably close restroom access as needed" and "should avoid environments where this is not expected." *Id.* at 1566, 1582.

The Commissioner correctly recognizes that the ALJ placed some but not great weight on most of Dr. Mutchler's and Dr. Hallet's opinions except for their belief that

8

Plaintiff needed reasonably close restroom access. The Commissioner argues that the ALJ adequately explained, "there was nothing in the record in terms of frequency, duration, or intensity of either vomiting or diarrhea that would warrant such a restriction." (Doc. #12, *PageID* #1620 (parentheses omitted)).

The opinions of nontreating physicians—like those of Drs. Mutchler and Hallet—are not weighed under the treating-physician rule and, consequently, "are never assessed for 'controlling weight.'" *Gayheart v. Commissioner of Social Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). ALJs instead weigh nontreating physicians' "opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other factors 'which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion.'" *Id.* (citations omitted).

The ALJ explained her rejection of Dr. Mutchler's and Hallet's opinions about Plaintiff's need for restroom access as follows:

> [Their] suggested limitation for 'reasonably close restroom access as needed,' as there is nothing in the record in terms of frequency, duration, or intensity of either vomiting or diarrhea that would warrant such restriction. The claimant's complaints of constipation and nausea would not seem to warrant any such limitation, and regular work breaks should be sufficient to account for the claimant's diarrhea….

(Doc. #6, *PageID* #82).

The ALJ's reference to "nothing in the record…" is problematic because these physicians relied on evidence of record to support their opinions. They noted that the

9

evidence documented Plaintiff's "familial polypopsis w[ith] Gardner syndrome[:] s/p [no change] recent (10/16) GI resection (proto-colectomy) [and] J pouch + ileostomy." *Id*. at 1581; *see also* 1582 (noting, "as per above"); *see also PageID* #s 1565-66. In other words, Plaintiff's Gardner syndrome and related surgeries led Drs. Mutchler and Hallet to find that Plaintiff should have access to a reasonably close restroom as needed. *See id*.

The ALJ's reference to "nothing in the record" is also incorrect because Plaintiff's testimony constitutes some evidence of his need for frequent bathroom use—he told the ALJ, "I go to the bathroom 15 to 20 times a day right now…." *Id*. at 101. "'There is no question that subjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record.'" *Cruse v. Comm'r of Soc. Sec*., 502 F.3d 532, 542 (6th Cir. 2007) (citations omitted). Plaintiff's underlying medical conditions, particularly Gardner syndrome and related symptoms are well documented.

Emergency room treatment records in May 2016, before his September 2016 colectomy, indicate that Plaintiff was positive for nausea, vomiting, abdominal pain, and constipation. *Id*. at 429. Two weeks after his ileostomy in December 2016, he reported to the emergency room with abdominal pain so severe that he "was unable to take a deep inspiration." *Id*. at 1370. He was having 8 to 10 bowel movements per day since his ileostomy takedown (on December 15, 2016). *Id*. at 1370.

In January 2017, Dr. Johnson described Plaintiff's Gardner syndrome as "a genetic condition leading to cancer in 100% of cases without surgery. On 9/26/16 he underwent

10

removal of his entire colon & rectum with creation of a temporary ileostomy. The ileostomy was closed 12/15/16. He was readmitted for a small bowel obstruction and related 12/26." *Id*. at 666. Dr. Johnson also reported that Plaintiff "has had issues with chronic abdominal pain as well as weakness & altered bowel function due to his surgery…." *Id*. at 667. Although the ALJ correctly observed that Dr. Johnson did not describe Plaintiff's bathroom-use frequency or duration, Dr. Johnson's report is consistent with the opinions of Drs. Mutchler and Hallet, and sheds some light on the underlying medical condition that creates his need for reasonably close restroom access.

In February 2017, Plaintiff reported to the Social Security Administration "still has to go to the bathroom 10-20 times a day (this is worse since he had the [ileostomy] takedown)." *Id*. at 1577.

In June 2017, he reported having nausea and "frequent BM's, 10-15 per day and many times at night." *Id*. at 1477. In late June 2017, Plaintiff told emergency room physicians that he had chronic daily nausea and loose stools secondary to his previous surgery. A CT scan report stated, "Questionable wall thickening identified in the duodenum and proximal jejunum. Underlying enteritis [inflammation of the intestines[3]] would be a consideration. This is a new finding compared to the previous study." *Id*. at 1417. Examination showed, in part, that Plaintiff's mid-abdomen was tender to palpation (TTP), and the Final Impression was enteritis. *Id*. at 1418.

In July 2017, Dr. Johnson started Plaintiff on Bentyl, Imodium, and Reglan—

---
[3] Taber's Cyclopedic Medical Dictionary, p. 682 (19th ed. 2001).

medications that did not help, according to Plaintiff's testimony. In August 2017, Dr. Johnson performed a flexible pouchoscopy (an endoscopic exam). *See* https://www.vanderbilthealth.com/digestivedisease/31272. Before the procedure, Dr. Johnson described Plaintiff's diagnoses: "Status post total protocolectomy with ileal pouch anastomosis for Gardner syndrome with abdominal pain, nausea, and diarrhea." *Id*. at 1531. Dr. Johnson documented the same diagnoses after the procedure. *Id*.

"Subjective complaints of 'pain or other symptoms shall not alone be conclusive evidence of disability.'" *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (quoting, in part, 42 U.S.C. § 423(d)(5)(A)). When the claimant's medical records—as in the present case—contain objective medical evidence of an underlying medical condition, the question becomes, "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* (quoting *Duncan v. Sec'y of Health & Human Servc.*, 80 F.2d 847, 853 (6th Cir. 1986)). Substantial evidence must support the ALJ's assessment of Plaintiff's symptoms. *See Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007).

The evidence of record establishes that Plaintiff underwent the surgical removal of his entire colon and rectum due to Gardner syndrome. Dr. Johnson explained that Plaintiff inherited a genetic condition (Gardner syndrome) that leads to colon cancer in 100% of cases without surgery. (Doc. #6, *PageID* #s 666-67). This evidence leans heavily towards supporting Plaintiff's descriptions of his pain and other symptoms that require him to use the restroom frequently throughout the day. The ALJ did not accept Plaintiff's testimony

based on his activities of daily living and on the fact that he was able to work "for almost a year, albeit part-time…." *Id*. at 82. While the ALJ correctly considered Plaintiff's daily activities, *see* 20 C.F.R. § 404.1529(c)(3), his ability to engage in the activities the ALJ identifies was not reasonably contrary to the symptoms he describes. For example, the fact that he was doing some painting says little about his pain levels or his need for frequent restroom access. His ability to care for his 2 children during a 7-month period was made possible because his children, who were school aged, helped with household chores, and he coped with cooking by microwaving frozen meals. Family members helped with the yardwork because it was too much for him. Although he acknowledged he did "some shopping," *id*. at 107, the ALJ did not explore how frequently he could shop or how long he could shop. Plaintiff's ability to work part time ended because he went to too many doctor appointments—essentially showing his inability to succeed in working even part time. *See* Soc. Sec. R. 96-8p, 1996 WL 374184, *2 (defining "residual functional capacity" as the ability to work on a regular and continuing basis, 8 hours per day, 5 days per week); *see also Rogers*, 486 F.3d at 248-49 (minimal daily functions of driving, cleaning an apartment, caring for pets, laundry, reading, exercising, and watching the news are not comparable to typical work activities).

The ALJ's decision also states, "The record shows that [Plaintiff] stopped work after his mom died from the disease [Gardner syndrome], and this was without any complaints of related symptoms to doctors. When she died, he wanted testing, which was positive, and he underwent elective surgery. There was no acute or crisis condition…." (Doc. #6, *PageID*

13

#80). This passage unreasonably minimizes Plaintiff's health problems around the time his mother died in October 2016. There is no doubt that Plaintiff knew he had Gardner syndrome with accompanying symptoms. And his symptoms were there: emergency room treatment records indicate that in May 2016 he was positive for abdominal pain, nausea, vomiting, and constipation, *id*. at 429; a report in March 2016 stated that a colonoscopy showed multiple small polyps in his ascending colon measuring 2 to 4 mm, *id*. at 392; and the same report explained that dental "x-rays … showed he has some osteoma at his jaw and some extra molars, which is a condition associated with Gardner's syndrome," *id*. This evidence establishes that he knew in early 2016 about the serious nature of his Gardner syndrome. Any doubt about this—and there is none—is eliminated by his March 2016 treatment plan in which a physician wrote, "I had a long discussion with him in the office today. I suggested that at some point he is going to need total proctocolectomy. The patient is in agreement with this and I arranged for him to see Dr. Michael Johnson, a colorectal surgeon, to discuss the matter. Hopefully he will be able to have an ileoanal anastomosis." *Id*. at 394. This shows that by the time his mother died, he had known about his need for surgery for at least 7 months. Although when he would have the surgery was uncertain, the surgery was not "elective," as the ALJ described it. It was certainly not elective in the sense that some types of cosmetic surgery are elective. The fact, moreover, that his mother died from Gardner syndrome was a harsh reminder to Plaintiff the he needed surgery to treat his symptoms associated with Gardner's symptoms and prolong his own life.

      Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## VI. Remand

Remand is warranted when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand for an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

A remand for an award of benefits is unwarranted in the present case because the

evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence four of § 405(g) due to problems set forth above. On remand the ALJ should be directed to review Plaintiff's disability claim to determine anew whether he was under a benefits-qualifying disability, including, at a minimum, a reassessment of his residual functional capacity and a re-consideration of the evidence at steps four and five of the sequential evaluation.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Casey Call was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under sentence four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.

July 11, 2019                           *s/Sharon L. Ovington*
                                                              Sharon L. Ovington
                                                              United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).